**Donald THIGPEN, Petitioner,**

v.

**Fred SMITH, et al., Respondents.**

**Civ. A. No. 82–0456–H.**

United States District Court,
S.D. Alabama, S.D.

Feb. 28, 1985.

As Amended March 13, 1985.

---

**1522**

John L. Carroll, Mandell & Boyd, Montgomery, Ala., Jack Greenberg and James M. Nabrit, III, John Charles Boger, Anthony G. Amsterdam, N.Y. Univ. Law School, Stanley A. Teitler, New York City, for petitioner.

Ed Carnes, Asst. Atty. Gen., Montgomery, Ala., for respondents.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAND, Chief Judge.

This death penalty case came before the Court pursuant to a petition for writ of habeas corpus, 28 U.S.C. § 2254, filed by Donald Thigpen. Petitioner was convicted in 1976 of violating Title 14, § 319 *Code of Alabama*, 1940 (Recompiled 1958). That statute, since repealed, provided for a mandatory sentence of death where an inmate under a sentence of life imprisonment was convicted of murder. Petitioner has challenged § 319's constitutionality, both facially and as applied.[1] For the reasons set forth below, this Court has concluded that there is no merit to the petition, and that this cause is due to be dismissed with prejudice.

## I. FINDINGS OF FACT

Based upon the briefs and arguments of counsel, as well as the record as a whole,[2] the Court enters the following Findings of Fact:

1. On December 30, 1970, Donald Thigpen killed his girlfriend, Cassie Lee Davis, by shooting her at close range with a shotgun. Following a trial to a jury, Thigpen was convicted of the crime of first degree murder and sentenced to death. On May 15, 1973, the Alabama Court of Criminal Appeals affirmed the conviction, but pursuant to *Furman v. Georgia*, 408 U.S. 238,

---

1. Pursuant to a stipulation entered into by and between the parties, and later approved by the Court, the sole issue before this Court is the constitutionality of § 319. Order of December 5, 1983. All other claims have been dismissed with leave to refile should that become necessary.

2. In the Court's Order of December 5, 1983, the parties were told to state within fourteen (14) days whether or not they desired an evidentiary hearing. No hearing was requested by either party, and the Court considers the right to an evidentiary hearing on the issues of § 319's constitutionality to have been waived by both parties.

92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), reduced petitioner's sentence of death to life imprisonment. *Thigpen v. State*, 50 Ala. App. 176, 277 So.2d 922, 926 (1973). It appears from the language in that opinion ("the sentence is reduced to life imprisonment") that Thigpen may have been eligible for parole at some future date.

2. In April of 1975, while still under a sentence of life imprisonment, Thigpen and ten other inmates escaped from Holman Prison. In the course of the escape attempt, he and Pedro Williams, who escaped with him, murdered one Henry Lambeth. On August 17, 1976, petitioner was convicted and sentenced to death in the Circuit Court of Escambia County, Alabama for violation of Title 14, § 319, *Code of Alabama,* 1940 (Recompiled 1958) (repealed, effective January 1, 1980). Section 319 provided as follows:

> Any convict sentenced to imprisonment for life, who commits murder in the first degree while such sentence remains in force against him, shall, on conviction, suffer death.

3. Testimony at the trial established that Thigpen, Williams and others escaped on April 16, 1975, and that Henry Lambeth was murdered early in the morning of April 17, 1975. Thigpen and Williams were apprehended in a pickup truck, following a high speed chase, later that morning. The truck was found to be registered to Henry Lambeth. (Escam. Tr. Vol. II, 32–33, 35, 74–75)[3] Mr. Lambeth, an elderly man, owned a farm located a few miles from Holman Prison. *(Id.)* Two Holman prison employees, who knew Mr. Lambeth, went to his farm to check on him because of the report that his pickup truck had been recovered in the possession of two escapees. *(Id.* at 32) Mr. Lambeth's wife had last seen her husband when he left the house in his pickup truck at approximately 6:00 A.M. that morning for the purpose of mending a fence where some of his cows had been getting out of their pasture. *(Id.* at 21–23, 32) The correction officials found

where Mr. Lambeth had been working on a fence. *(Id.* at 32) Under the fence was a large puddle of blood, and nearby was an ax and some loose fence posts. *(Id.* at 33–34, 40–41, 51–53, 78–82; Vol. III, 5–7) The correction officials found Mr. Lambeth's body in an old abandoned house nearby. (Escam. Tr. Vol. II, 33, 51–53, 78–82; Vol. III, 3, 4, 8) It was estimated that Mr. Lambeth was murdered some time between 6:00 A.M. when he left the house with his pickup truck and 8:20 A.M. to 9:00 A.M., when Thigpen and Williams were spotted driving the pickup truck some 20 to 30 miles away. (Escam. Tr., Vol. II, 21–22, 57, 63)

4. There was testimony at trial by a pathologist, who was unable to state specifically what instrument was used to kill Mr. Lambeth, but that the wounds found on Mr. Lambeth's body were consistent with those that could be inflicted with an ax or a hatchet, *Thigpen v. State*, 355 So.2d 392, 394 (Ala.Crim.App.), *aff'd,* 355 So.2d 400 (Ala.1977), and with those that could be inflicted with a fence post. (Escam. Tr. Vol. II, 111–112) The blue jeans, shirt, and undershirt worn by Thigpen at the time of his arrest had bloodstains on them. Testimony established that the blood was different from Thigpen's blood type and matched Mr. Lambeth's blood type. *(Id.* at 28–29, 87, 98–100, 103–109, 112–113)

5. On April 18, 1975, the day after the murder, Pedro Williams gave a statement to an investigating officer concerning the murder. (Escam. Tr., Vol. II, 130–135) In that statement, Williams asserted that Thigpen had killed Mr. Lambeth with an ax which he (Thigpen) had gotten from the back of Lambeth's pickup truck. *(Id.* at 132, 134) According to Williams, he and Thigpen were hiding in some bushes near the old abandoned house when Lambeth drove up in his pickup truck and started loading fence posts. *(Id.* at 131–132) Then, according to Williams, the following events occurred:

---

**3.** References to the transcripts of various proceedings are abbreviated as follows:

| | |
|---|---|
| Escambia County Criminal Trial (1976): | Escam. Tr. |
| Escambia County Coram Nobis: | Escam. Cor. Nob. |
| Jefferson County Criminal Trial (1972): | Jeff. Tr. |
| Jefferson County Coram Nobis: | Jeff. Cor. Nob. |

I said, I think I'm going to get that truck because the keys are in it. I went directly to the truck talking (to Lambeth). How you all get over here, he said. That don't matter. He watched [sic] off the head and poles and load the poles. He said let me help you load the poles. He said, no, that is all right. So I was getting in the truck that time. Thigpen was standing there and saying that. I told Thigpen I said no, man. Thigpen tried to hit him in the foot with the poles or something. He grabbed an ax. It was an ax on the truck. [sic]

(Escam. Tr., Vol. II, 132) Thereafter, Williams went on to state:

Thigpen [grabbed an ax]. He grabbed the ax and hit the old man with it. The old man fell down. He told me to come over here. Come on over here and help me. I said what you done done? [sic] He said, I believe he is dead. Say, I got to kill him because I don't want to leave no evidence. He took him. I grabbed him by the legs. As you can see I had him by the foot to help you raise him up through the window so I started driving. [sic]

(*Id.* at 133)

6. On April 21, 1975, Williams gave a second statement to the investigators, and in that statement he once again reiterated that it was Thigpen who had struck and killed Mr. Lambeth. Williams said in part that, Thigpen walked around the old man and the man was watching Pedro (Williams) and turned his back on Thigpen and Thigpen struck him with the ax. And Pedro (Williams) said when the man fell he fell into (Williams') arms (who) lowered him to the ground. (Escam. Tr., Vol. II, 137)

7. At trial, Williams took the stand and testified that he, rather than Thigpen, actually struck and killed Mr. Lambeth. (Escam. Tr., Vol. II, 117–124, 127–129) Williams admitted making prior statements that Thigpen had murdered Lambeth, but claimed they were untrue. (*Id.* at 130–134, 137)

8. The record clearly indicates that Williams did not change his story until after he had plead guilty to a charge of second degree murder and had been sentenced to ninety-nine (99) years for that crime. (Escam. Tr., Vol. II, 118–119, 141) Thus, Williams had nothing to lose if he helped Thigpen out. In addition, Williams' change of story appears to have been influenced by a letter that he received from Thigpen. In that letter Thigpen: professed his great friendship for Williams; told Williams he was just like a "little bro" to Thigpen, and meant everything to him; told Williams that some day he would be able to show it; said if they got "out of this shit, we'll just try to make us some money in here and live, O.K." (Escam. Tr., Vol. III, 15) Thigpen also told Williams that he wanted Williams to be a man about their situation, because "they don't have anything on us, but they are [going to] try to fuck us up, you know, but you know how they are, man. Just be cool and I'll see to that everything is did right, every time so anyone come to see you, just tell them to see me!" (*Id.* at 15–16) Thigpen went on to urge Williams not to talk with a lawyer unless Thigpen and Williams were together, because "we need to be together." (*Id.* at 16) Thigpen also told Williams that he was going to have his (Thigpen's) sister write Williams, so if Williams wanted Thigpen to know anything he could write Thigpen's sister who would tell Thigpen. (*Id.*) Thigpen ended his letter to Williams with the statement that he should, "be cool and live on". (*Id.*)

9. Both of Williams' prior inconsistent statements along with the letter from Thigpen were introduced into evidence at trial. (Escam. Tr., Vol. II, 130–139; Vol. III, 15–16)

10. Thigpen took the stand, denied any involvement in the actual act of killing Mr. Lambeth, and said Williams did it. (Escam. Tr., Vol. II, 144–148) He also admitted prior convictions for grand larceny and the aforesaid conviction for the murder of his "wife" for which he was serving the life sentence at the time he escaped. (*Id.* at 148–149)

11. Following the close of evidence, the trial court instructed the jury, pursuant to

Alabama law, that it was the jury's function to determine the weight and credibility to be given to each witness' testimony, and in doing so the jury could consider the witness' honesty, integrity and relationship to the defendant.[4] (Escam. Tr., Vol. II, 162–163) The trial judge also instructed the jury that a witness may be impeached by a prior inconsistent statement, and that if the jury was convinced a witness had testified falsely the jury could disregard his entire testimony. (*Id.* at 162–163, 167–168)

12. The trial court went on to instruct the jury that the first degree murder indictment against Thigpen also included the lesser included offense of second degree murder. Specifically, the trial court charged the jury as follows:

It becomes necessary for me as presiding judge to define for you the different offenses which are included in this particular indictment, because even though it charges Murder in the First Degree it also includes a lesser offense. We will first take Murder in the First Degree. Murder in the First Degree is the willful, malicious, deliberate and premeditated killing of one human being by another. Willful, malicious, deliberate, and premeditated; all four of these elements must concur and coexist to make it Murder in the First Degree. The defendant is charged with willfully, maliciously, and with deliberation and premeditation of taking the life of Henry Lambeth. Now willful is used in the legal sense as just an intentional act governed by the will of the person acting and not as an accident. That is the definition of the word willful. Malice in the law does not mean necessarily hate and ill will. Malice is defined as an unlawful act willfully done without a just cause or legal excuse. Malice is a mental state or condition which prompts the doing of an unlawful act without a legal excuse or legal justification. It is one of the ingredients of murder and may be defined in the legal phrase, "the killing of a human being without legal

excuse." I charge you that malice may be inferred from the use of a deadly weapon unless the circumstances attending the use of a deadly weapon refutes the presumption of malice and are sufficient to refute that in your minds.

The word deliberation and premeditation are used in this indictment: these words merely mean the slayer must intend to strike the blow which takes the human life at the time he did that act. There is no certain length of time for which you must deliberate or for which it must be premeditated. In other words, if a slayer has time to think, however short the time may have been, even for a single moment, and such a slayer did think and did strike a blow or fire a shot intending that the result would be the death of the other person produced by the momentary operation of his mind, there would be premeditation and deliberation as defined by law in a charge of Murder in the First Degree. Now so much for capital Murder in the First Degree. Those four elements as I have outlined them for you must coexist.

This indictment also charges Murder in the Second Degree, and there is a distinction that you make in your minds. I will try at this time to explain as best I can Murder in the Second Degree. Murder in the Second Degree is the willful and malicious killing of a human being but without premeditation or deliberation. It means that the person may not have thought of and premeditated the killing but he must do it with a fixed hate or under such circumstances as in your mind would raise a presumption of malice. That is the distinction—no premeditation and deliberation in the Second Degree.

(Escam. Tr., Vol. II, 158–159)

13. The Court also instructed the jury as follows:

I charge you that if you find the Defendant guilty the punishment under this

---

**4.** It was undisputed that Williams and Thigpen were close friends. (Escam.Tr., Vol. II, 136, 144; Vol. III, 15–16)

indictment is not with this Court. Such punishment is left with you. If you find the Defendant guilty of Murder in the First Degree you can impose only one punishment: that of death due to the provisions of Title 14, Section 319, of the Code of Alabama of 1940, as amended and recompiled. That I read to you at the beginning of this oral charge.

If after consideration of all of the evidence you do not believe beyond all reasonable doubt and to a moral certainty this killing was deliberate and premeditated but you do believe this killing was maliciously done or willfully done you may find the Defendant guilty of Murder in the Second Degree as I have defined that offense to you and in that event the form of your verdict would be: "We, the jury, find the Defendant guilty of Murder in the Second Degree as charged in the indictment and fix his punishment at imprisonment in the State Penitentiary for so many years," not less than ten or as many above ten as you see fit to impose on him, ten being the minimum sentence but no maximum being set by the law of our State.

On the other hand, if after considering the evidence in this case you are not convinced beyond a reasonable doubt and to a moral certainty that the Defendant is guilty of any offense he would, of course, be entitled to an acquittal, and the form of your verdict would be: "We, the jury, find the Defendant not guilty."

(Escam. Tr., Vol. II, 163–164)

14. The trial court judge also read to the jury some of the written charges requested by the defendant and instructed the jury that they were correct statements of the law. (Escam. Tr., Vol. II, 164–167) Among the written requested charges which were read to the jury were the following:

The law does not countenance the conviction of any person for an offense not contemplated, intended, or committed by him, and of which he had no knowledge that the offense was about to be committed.

It is for you the jury to decide, however, from all the evidence, first, whether Donald Thigpen participated in the alleged killing, and, if so, whether he did so knowingly and with knowledge of its purpose.

(Escam. Tr., Vol. II, 166)

15. The trial court also instructed the jury on the aiding and abetting doctrine, but those instructions did not permit the jury to convict Thigpen of first degree murder unless it found that he intentionally killed the victim, or that he intentionally entered into a common enterprise or adventure to kill the victim, or that he intentionally aided and abetted the killing. (Escam. Tr., Vol. II, 158–161, 166) The jury was specifically instructed that: "The law does not countenance the conviction of any person for an offense not contemplated, intended, or committed by him, and of which he had no knowledge that the offense was about to be committed." (Id. at 166) See Thigpen v. State, 355 So.2d 392, 399 (Ala. Crim.App.) (on rehearing), aff'd, 355 So.2d 400 (Ala.1977) (per curiam).

16. Following Thigpen's conviction and sentence of death, the Alabama Court of Criminal Appeals affirmed Thigpen's conviction and sentence on August 16, 1977, and the Alabama Supreme Court affirmed that decision on December 9, 1977. Thigpen v. State, 355 So.2d 392 (Ala.Crim. App.), aff'd, 355 So.2d 400 (Ala.1977) (per curiam). Thigpen did not file a petition for certiorari in the United States Supreme Court on direct appeal, and on May 2, 1978, the Alabama Supreme Court set June 9, 1978 as the date for Thigpen's execution. (Escam.Cor.Nob., 16)

17. In May of 1978, Thigpen filed in the United States District Court for the Middle District of Alabama an action pursuant to 42 U.S.C. § 1983 in which he sought declaratory and injunctive relief with respect to the state coram nobis proceedings Thigpen anticipated filing concerning his convictions and death sentence. Thigpen v. Wallace, No. 78–189–N (M.D.Ala.) Among other things, Thigpen sought an order requiring state officials to provide him with funds in order to finance his coram nobis effort in state court, along with an order staying his

scheduled execution. On May 31, 1978, the District Court, J. Varner, presiding, entered an order denying a stay of execution, and on October 23, 1978 entered an abstention order dismissing the case without prejudice to completion of any state court proceedings. Thigpen initially entered notice of appeal, but later that appeal was dismissed at his request.

18. On June 1, 1978, Thigpen filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court. In his petition he challenged his two murder convictions and one death sentence, and requested a stay of execution. *Thigpen v. Oliver*, No. 78–312–H; (Escam. habeas petition at ¶ 11(a) and ans. at ¶ 3(a)).

19. On June 6, 1978, Thigpen filed a petition for a writ of error coram nobis and application for stay of execution in Escambia County Circuit Court attacking his conviction for murdering Henry Lambeth. (Escam.Cor.Nob., 1–17) That same day the Escambia County Circuit Court entered an order staying Thigpen's execution pending further order. (*Id.* at 18) As a result, on June 9, 1978, this Court dismissed Thigpen's habeas petition for failure to exhaust state remedies and denied his application for stay of execution as moot. *Thigpen v. Oliver*, No. 78–312–H (order) (per Hand, J.); (Escam.Hab.Pet. at ¶ 11(a)).

20. After an extensive evidentiary hearing, the coram nobis petition attacking Thigpen's 1976 murder conviction and death sentence was denied by the Escambia County Circuit Court on September 8, 1978. (Escam.Cor.Nob. No. 66–72) That court initially reset Thigpen's execution date, but then stayed it pending appeal and further order of the Court. (*Id.* at 71–72, 500–501) On June 5, 1979, the Alabama Court of Criminal Appeals affirmed the denial of coram nobis relief, and on September 21, 1979, the Alabama Supreme Court denied certiorari. *Thigpen v. State*, 374 So.2d 401 (Ala.Crim.App.), *cert. denied*, 374 So.2d 406 (Ala.1979). Thigpen did not file a petition for writ of certiorari in the United States Supreme Court in the Escambia County coram nobis proceedings.

21. Meanwhile, on July 26, 1978, Thigpen filed a coram nobis petition in Jefferson County Circuit Court attacking his 1972 murder conviction in that county of his "common law wife". (Jeff.Cor.Nob., 191–200) Following an evidentiary hearing, the Jefferson County Circuit Court denied the petition on September 8, 1978. (*Id.* at 204–214) On April 17, 1979, the Alabama Court of Criminal Appeals affirmed the denial of coram nobis relief, and on July 6, 1979, the Alabama Supreme Court denied certiorari. *Thigpen v. State*, 372 So.2d 385 (Ala.Crim.App.), *cert. denied*, 372 So.2d 387 (Ala.1979). Thigpen went on to petition the United States Supreme Court for certiorari, which was denied on January 7, 1980. *Thigpen v. Alabama*, 444 U.S. 1026, 100 S.Ct. 690, 62 L.Ed.2d 660.

22. On May 10, 1982, Thigpen filed a habeas petition (the present one) in this Court attacking the validity of his 1976 Escambia County murder conviction and death sentence (Civil Action No. 82–0456–H). On May 12, 1982, Thigpen filed another habeas petition in the United States District Court for the Northern District of Alabama, challenging his 1972 Jefferson County murder conviction. That proceeding was ordered transferred to this Court from the Northern District. (Civil Action No. 82–A–0616–H) On June 22, 1983, this Court entered an order consolidating the two cases for all purposes. Answers have been filed by the State. Following considerable investigation and discussion concerning other aspects of this case, the parties filed an agreement and stipulation concerning further proceedings in this case. Pursuant to that agreement and stipulation of the parties, on December 5, 1983, this Court entered an order dismissing without prejudice all of the consolidated habeas petitions except for the issues involving the constitutionality of Title 14, § 319, *Code of Alabama* (Recompiled 1958). See footnotes 1 and 2, *supra*.

23. Additional facts will be discussed where appropriate in the Conclusions of Law.

## II. CONCLUSIONS OF LAW

### A. *Jurisdiction*

The Court concludes that it has jurisdiction over this petition. (Findings of Fact 16–21)

### B. *Petitioner's Claims*

In attacking § 319, both facially and as applied, the petitioner advances nine arguments, of which the first five argue the facial unconstitutionality of the statute. He first asserts that the statute is unconstitutional because it prevents individualized consideration of all relevant sentencing factors. Next, he claims § 319 creates a danger of jury nullification. Third, petitioner argues that § 319 is unconstitutional because it precludes a meaningful appellate review of the sentence. Fourth, he claims the statute offends fundamental societal values. Petitioner's fifth argument is that § 319 constitutes excessive punishment and is not penologically justified. Sixth, petitioner, who is black, claims that the State of Alabama has historically applied the death penalty in a racially discriminatory manner. Seventh, he asserts that § 319 violates the Eighth and Fourteenth Amendments because it has been rarely and arbitrarily applied. His eighth argument is that § 319 has been applied in a racially and sexually discriminatory manner. Finally, he argues his death sentence is unconstitutionally disproportionate to what he alleges was his "relatively minor involvement in the crime".

After reviewing these nine claims, the Court, for reasons stated below at sub-section IIE, concludes that there is no merit to these claims, and that the petition is due to be DENIED and DISMISSED. Before evaluating petitioner's assertions, however, the Court needs to address several preliminary matters.

### C. *The Constitutionality of § 319 is an Open Question*

As previously noted, Title 14, § 319, *Code of Alabama* 1940 (Recompiled 1958) (repealed effective January 1, 1980) provided that, "[a]ny convict sentenced to imprisonment for life, who commits murder in the first degree while such sentence remains in force against him, shall, on conviction, suffer death." A review of past decisions of the United States Supreme Court indicates that statutes like § 319 have not been held to be unconstitutional by that Court, and, indeed, the Supreme Court has specifically reserved the question of whether such statutes are constitutional.

In *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), the United States Supreme Court stated:

> This case does not involve a mandatory death penalty statute limited to an extremely narrow category of homicide, such as murder by a prisoner serving a life sentence, defined in large part in terms of the character or record of the offender. We thus express no opinion regarding the constitutionality of such a statute. See n. 25, infra.

*Id.* at 287, n. 7, 96 S.Ct. at 2983 n. 7. Footnote 25 of the *Woodson* opinion reiterated that position: "We have no occasion in this case to examine the constitutionality of mandatory death sentence statutes applicable to prisoners serving life sentences." *Id.* at 292–293, 96 S.Ct. at 2985.

Similarly, in *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), which struck down a statute providing for mandatory death sentences for limited categories of murder, the Supreme Court once again held open the issue of mandatory death sentences for life term prisoners convicted of murder. The court said:

> Only the third category of the Louisiana first degree murder statute covering intentional killing by a person serving a life sentence or by a person previously convicted of an unrelated murder, defines the capital crime at least in significant part in terms of the character or record of the individual offender. Although even this narrow category does not permit the jury to consider possible mitigating factors, a prisoner serving a life sentence presents a unique problem that may justify such a law. (citations omitted)

*Id.* at 334, n. 9, 96 S.Ct. at 3006, n. 9 (joint plurality opinion of Stewart, Powell and Stevens, JJ.) The following year, in another case involving a mandatory death penalty, the Court struck down a mandatory death sentence for the first degree murder of a police officer, but again stated, "We reserve again the question whether or in what circumstances mandatory death sentence statutes may be constitutionally applied to prisoners serving life sentences...." *Roberts (Harry) v. Louisiana,* 431 U.S. 633, 637, n. 5, 97 S.Ct. 1993, 1995, n. 5, 52 L.Ed.2d 637 (1977).

As far as this Court is able to determine, no member of the United States Supreme Court has ever withdrawn that language.[5] *But, see Shuman v. Wolff,* 571 F.Supp. 213, 216 (D.Nev.1983).[6] Based upon those statements by the United States Supreme Court, this Court concludes that the question of whether or not § 319 is facially constitutional is still an open question. Indeed, the language used by various members of the United States Supreme Court seems to signal that statutes like § 319 very well may be constitutional.

### D. *Standard of Review*

■ In order to determine whether Thigpen is entitled to relief, the Court must settle a question raised by the State. The State contends that the petitioner must do more than establish that § 319 is unconstitutional on its face, indeed, the State claims that facial attacks are not cognizable in federal habeas corpus proceedings. Rather, the State argues that the petitioner must establish not only that § 319 is unconstitutional, but also that he was adversely affected by the constitutional violation. The Court concludes that within the context of a proceeding under 28 U.S.C. § 2254, a petitioner must establish not only the facial invalidity of a statute, but also that he suffered actual prejudice from the application of the statute.

■ It must be remembered that this is a federal habeas corpus proceeding, and not a direct appeal. A writ of habeas corpus may be granted to a petitioner "only on the ground that he is in custody in violation of the Constitution," 28 U.S.C. § 2254(a), not on the ground that some other defendant's incarceration or sentence is unconsti-

---

5. The Supreme Court has referred to the above cited footnotes or the issue underlying them in death penalty cases not directly dealing with mandatory sentences. See *Lockett v. Ohio,* 438 U.S. 586, 604 & n. 11, 98 S.Ct. 2954, 2964 n. 11, 57 L.Ed.2d 973 (no opinion as to whether the need to deter certain kinds of homicide would justify a mandatory death sentence as, for example, when a prisoner—or escapee—under a life sentence is found guilty of murder); *Gregg v. Georgia,* 428 U.S. 153, 186, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976) ("There are categories of murder, such as murder by a life prisoner, where other sanctions may not be adequate.") (joint plurality opinion of Stewart, Powell and Stevens, JJ.); *Furman v. Georgia,* 408 U.S. 238, 307, 92 S.Ct. 2726, 2761, 33 L.Ed.2d 346 (1972). The Eleventh Circuit Court of Appeals recently recognized that the Supreme Court's pronouncements imply "that mandatory death penalty statutes applied to an extremely narrow category of crimes defined in large part in terms of the offender's character or record may be constitutionally permissible." *Moore v. Balkcom,* 716 F.2d 1511, 1523 (11th Cir.1983). *See also Graham v. Superior Court, Etc.,* 98 Cal.App.3d 880, 160 Cal.Rptr. 10, 12 (1979) (hearing denied) (1980) (United States Supreme Court has specifically *not* held that all mandatory death penalty statutes would be constitutionally defective) (emphasis in original).

6. Recently the United States Supreme Court, 53 U.S.L.W. 3589, 3599 (U.S. Feb. 19, 1985), No. 84–355 refused certiorari in and left standing *People v. Smith,* 63 N.Y.2d 41, 479 N.Y.S.2d 706, 468 N.E.2d 879 (1984), a New York Court of Appeals decision which struck down a New York statute similar to § 319. The New York Court of Appeals held the statute unconstitutional in large measure because it failed to provide for sufficient individualized consideration of the offense. 479 N.Y.S.2d at 722, 725, 468 N.E.2d 879. This Court concludes that the Supreme Court's decision not to grant certiorari is not a holding that the statute is unconstitutional, nor is it a withdrawal of the reservation of the issue *sub judice.* "It is 'well-settled ... that denial of certiorari imparts no implication or inference concerning the Court's view of the merits.' *Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 366 n. 1, 93 S.Ct. 647, 650 n. 1, 34 L.Ed.2d 577 (1973)." *Hathorn v. Lovorn,* 457 U.S. 255, 262 n. 11, 102 S.Ct. 2421, 2426 n. 11, 72 L.Ed.2d 824; *Polites v. United States,* 364 U.S. 426, 433 n. 9, 81 S.Ct. 202, 206 n. 9, 5 L.Ed.2d 173; *The Poster Exchange, Inc. v. National Screen Service Corp.,* 362 F.2d 571, 574 (5th Cir.1966).

tutional. The mere possibility of constitutional error is not enough to warrant habeas relief, *Harris v. Rivera,* 454 U.S. 339, 347 n. 17, 102 S.Ct. 460, 465 n. 17, 70 L.Ed.2d ·530 (1981), and the burden of establishing an actual constitutional violation which affected him is on the habeas petitioner. *Rose v. Mitchell,* 443 U.S. 545, 564–565, 99 S.Ct. 2993, 3004, 61 L.Ed.2d 739 (1979); *Walker v. Johnston,* 312 U.S. 275, 286, 61 S.Ct. 574, 579, 85 L.Ed. 830 (1941). That is the rationale behind the Supreme Court's pronouncement in *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 3391, 77 L.Ed.2d 1090 (1983), when it stated:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception. When the process of direct review—which, if a federal question is involved, includes the right to· petition this Court for a writ of certiorari—comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

Thus, permitting facial attacks on state statutes to be heard in federal habeas proceedings would be fundamentally inconsistent with the secondary and limited role of such proceedings as described in the *Barefoot*.opinion.

■ Such attacks would also be inconsistent with the adverse impact or prejudice requirement.which is interwoven throughout habeas law. As previously noted, a habeas petition must establish not only that some statute, procedure, or action was unconstitutional, but also that that petitioner was adversely affected by the constitutional violation. *E.g., Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977); *Daniels v. Maggio,* 669 F.2d 1075, 1084 (5th Cir.1982); *Ashley v. Wainwright,* 639 F.2d 258, 260 n. 4 (5th Cir. Unit B 1981); *Lockett v. Blackburn,* 571 F.2d 309, 314 (5th Cir.1978) *cert. denied,* 439 U.S. 873, 99 S.Ct. 207, 58 L.Ed.2d

186 (1978). The prejudice or adverse impact requirement applies with full force to federal habeas proceedings involving capital sentences. *E.g., Stanley v. Zant,* 697 F.2d 955, 972 (11th Cir.1983); *Tucker v. Zant,* 724 F.2d 882, 892–893 (11th Cir.1984); *see also, Hopper v. Evans,* 456 U.S. 605, 613–614, 102 S.Ct. 2049, 2054, 72 L.Ed.2d 367 (1982).

The United States Supreme Court's holdings about the facial invalidity of various capital punishment schemes have, significantly, all been made in cases before that court on certiorari from direct appeal. *See,* for example, *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Roberts (Harry) v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). And that is because the·nature of the inquiry and the prejudice requirement in a collateral proceeding is different than that which pertains on direct appeal. *E.g., Henderson v. Kibbe,* 431 U.S. at 154, 97 S.Ct. at 1736; *Rose v. Lundy,* 455 U.S. 509, 543–545, 102 S.Ct. 1198, 1216–1217, 71 L.Ed.2d 379 (1982). In capital cases reaching the United States Supreme Court, under § 2254, the Court has required adverse impact or prejudice to the petitioner himself. *Hopper v. Evans, supra.*

For example, in *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the United States Supreme Court held, in effect, that the preclusion clause of Alabama's 1975 capital punishment statute was facially invalid. In *Hopper v. Evans, supra,* the Court held that one pre-*Beck* defendant was not entitled to habeas relief as a result of the preclusion clause because it did not prejudice him. The *Beck* decision came on direct appeal; the *Evans* decision came in a § 2254 proceeding.

■ By definition, a claim that a statute is invalid on its face involves ·no inquiry into whether prejudice or adverse impact

exists in any particular case. Numerous precedents of the United States Supreme Court, the Fifth Circuit and the Eleventh Circuit establish that prejudice or adverse impact is a prerequisite of a valid § 2254 claim. Therefore, this Court concludes that Thigpen's claim that § 319 is invalid on its face is not cognizable in this proceeding, but rather the petitioner must prove both the facial invalidity of the statute as well as prejudice or adverse impact. Thus, the Court must look at both the constitutionality of the statute and the extent to which, if any, the petitioner was prejudiced by the statute.

In reviewing the facial validity of the statute and the prejudice, if any, suffered by the petitioner, the Court will first determine whether the statute is or is not facially constitutional, and then in the alternative determine whether or not the petitioner has suffered any prejudice from the alleged facial invalidity of the statute.

■ Furthermore, the petitioner has the heavy burden of overcoming the presumptive validity of the statute. *Gregg v. Georgia*, 428 U.S. at 175, 96 S.Ct. at 2926. *Accord, Parham v. Hughes*, 441 U.S. 347, 351, 99 S.Ct. 1742, 1745, 60 L.Ed.2d 269 (1979) (plurality opinion); *Flemming v. Nestor*, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960); *Alabama State Federation of Teachers v. James*, 656 F.2d 193, 195 (5th Cir. Unit B 1981), *See Seoane v. Ortho Pharmaceuticals*, 660 F.2d 146, 151 (5th Cir.1981).

In determining whether a petitioner has carried his burden of establishing the unconstitutionality of a statute, it is important to distinguish between constitutionality and wisdom. As Justice Stewart pointed out:

If the Constitution gave me a roving commission to impose upon the criminal courts of Texas my own notions of enlightened policy, I would not join the Court's opinion. For it is clear to me that the recidivist procedures adopted in recent years by many other States—and by Texas herself since January 1st of

last year—are far superior to those utilized in the cases now before us. But the question for decision is not whether we applaud or even whether we personally approve the procedures followed in these recidivist cases. The question is whether those procedures fall below the minimum level the Fourteenth Amendment will tolerate. Upon that question I am constrained to join the opinion and judgment of the Court. (footnotes omitted)

*Spencer v. Texas*, 385 U.S. 554, 569, 87 S.Ct. 648, 656, 17 L.Ed.2d 606 (1967) (concurring opinion of Stewart, J.) Similarly, see *Rummel v. Estelle*, 445 U.S. 263, 285, 100 S.Ct. 1133, 1145, 63 L.Ed.2d 382 (1980) (concurring opinion of Stewart, J.); *Johnson v. Louisiana*, 406 U.S. 356, 365–366, 92 S.Ct. 1620, 1626–35, 32 L.Ed.2d 152 (1972) (concurring opinion of Blackmun, J.). This same principal applies in capital punishment cases. *Gregg v. Georgia*, 428 U.S. at 174–175, 96 S.Ct. at 2926 (joint opinion of Stewart, Powell and Stevens, JJ.); *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984);[7] *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 3460, 77 L.Ed.2d 1171 (1983) in which the court stated: "We sit as judges, not as legislators, and the wisdom of the decision to permit juror consideration of possible commutation is best left to the States." *Accord, e.g., Henry v. Wainwright*, 721 F.2d 990, 997 (5th Cir. Unit B 1983) ("It is not the function of this court to legislate state laws and procedures; we only evaluate constitutional attacks upon them.") Thus, the question before the Court is not the wisdom of the mandatory provisions of § 319, but whether or not it is constitutional. In answering that question this Court recognizes the statute's presumptive validity and the heavy burden that the petitioner must overcome in attacking the statute.

E. *Petitioner's Claims for Relief*

As previously noted the petitioner has raised nine separate claims for relief, of which the first five are facial attacks on the statute. The Court has considered peti-

7. The explanation for *Pulley v. Harris* is that what judges, even Supreme Court Justices, view as wise policy is not necessarily constitutionally required.

tioner's arguments, and for the reasons stated below has concluded that there is no merit to any of them.

### 1. *Particularized Consideration of the Petitioner.*

■ Petitioner first argues that § 319 is unconstitutional because it does not provide for sufficient consideration of the character and record of the individual offender and the circumstances of the particular offense which is a constitutionally indispensable part of the process of inflicting the penalty of death. *Woodson v. North Carolina*, 428 U.S. at 304, 96 S.Ct. at 2991. He further argues that in *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the United States Supreme Court interpreted its prior holdings in death penalty cases to mean that all mandatory death penalty statutes are unconstitutional.[8] The State does not quarrel with petitioner's assertion that individualized consideration is required, but rather urges that the appropriate question is "whether the consideration of the character and record of the individual offender and the circumstances of the offense built into § 319 is constitutionally sufficient." (State's Brief at 31) The Court believes that is the correct question.

First, individualized consideration of relevant factors is built into the definition of the capital offense contained in § 319. No defendant can be convicted of this very narrow capital offense unless he is already serving a sentence of life imprisonment at the time that he commits the murder for which he is being tried. That element of the offense itself establishes the murderer's character and record in every meaningful sense of those terms. Not only has the life term prisoner recently committed murder, but he has also been convicted of a prior unrelated crime so serious that he has already been serving a life sentence. And in the case of Thigpen, his earlier crime was the willful and malicious shotgunning to death of a helpless woman in front of a young child.

As the Supreme Court noted in its footnote in *Woodson*, a mandatory death penalty statute limited to murder by a prisoner serving a life sentence defines the crime in *large part* in terms of the character and the record of the offender. *Id.*, 428 U.S. at 287 n. 7, 96 S.Ct. at 2983 n. 7 (joint plurality opinion of Stewart, Powell and Stevens, JJ.). (emphasis added)[9] There is little left to consider insofar as a § 319 defendant's record and character are involved, because it cannot be seriously contended that a life sentence inmate who committed murder had a good character or a good record. That is particularly true in the case of this petitioner who had now twice been convicted of murdering other people: a helpless woman, and an elderly farmer.

■ The same is true of the circumstances of the offense. By definition, under § 319 the offense must be a first degree murder committed during a life sentence. Under Alabama law, first degree murder is defined as willful, deliberate, malicious and premeditated killing. *E.g., Harjo v. State*, 395 So.2d 1104, 1105 (Ala.Crim. App.), *cert. denied*, 395 So.2d 1105 (Ala. 1981); *Young v. State*, 363 So.2d 1007, 1009 (1978). Premeditation and deliberation require intent to kill which is also an essential element of first degree murder, *e.g., Sanders v. State*, 392 So.2d 1280, 1282 (Ala.Crim.App.1980), and if premeditation or deliberation are lacking, the offense is second degree murder, *e.g., Miller v. State*, 40 So. 47 (Ala.1906); *Cooper v. State*, 364 So.2d 382, 387 (Ala.Crim.App.), *cert. denied*, 364 So.2d 388 (Ala.1978), and there can be no conviction under § 319. If malice is lacking or recognized provocation is present, the crime is manslaughter in the first degree, *Martin v. State*, 56 Ala.App. 33, 318 So.2d 772, *cert. denied*, 294 Ala. 765, 318 So.2d 775 (Ala.1975); *Wilkerson v. State*, 50 Ala.App. 150, 277 So.2d 423, *cert. denied*, 277 So.2d 427 (Ala.1973); *Palmore v. State*, 253 Ala. 183, 43 So.2d 399 (1949), and there can be no conviction under

---

**8.** This position was adopted by the United States District Court for Nevada in *Schuman v. Wolff,* *supra,* 571 F.Supp. at 216–217.

**9.** See discussion at Section IIC of this decision.

§ 319.[10] Therefore, the § 319 offense is also defined in large part in terms of the circumstances of the offense relevant to the capital sentencing decision. Only those intentional murders committed with premeditation and deliberation, committed without provocation, and committed maliciously come within the purview of § 319.

One of Thigpen's arguments to the effect that § 319 fails to give individualized consideration to the circumstances of the offense is his contention that he was convicted under the statute even though he lacked the intent to kill and played a very minor role in the murder of Henry Lambeth. That contention is based on a distortion of the record and his rejection of the jury's verdict. See discussion, *infra,* at Section IIE9 of this decision.

Thus, the facial validity issue is whether a mandatory statute which on its face applies only to willful, deliberate, premeditated, malicious murders committed without provocation by one already serving a life sentence for a previous conviction of another crime serious enough to have warranted such a sentence is unconstitutional. Thigpen's reliance on *Lockett v. Ohio* and *Woodson v. North Carolina, supra,* on this issue ignores the fact that the Supreme Court specifically excepted from its reasoning in those and other cases just such a mandatory statute as § 319, so narrowly drawn as to define as elements of the capital offense the defendant's bad character, bad record, and non-mitigating circumstances of the murder.

The Court also rejects petitioner's reliance on *Eddings v. Oklahoma, supra,* for the contention that it effectively struck down all mandatory death penalty statutes. First, *Eddings* did *not* involve a mandatory death penalty statute. The specific holding in *Eddings,* a case involving a discretionary death penalty statute, is that it was unconstitutional for the Oklahoma courts to conclude as a matter of law that a sentencer could not consider a defendant's family history as mitigating evidence in deciding whether to impose the death penalty. The Supreme Court reiterated its past decisions in *Lockett v. Ohio, Gregg v. Georgia,* and *Woodson v. North Carolina,* and concluded:

> Just as the state may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating evidence .... The sentencer in the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

*Eddings v. Oklahoma,* 445 U.S. at 113–114, 102 S.Ct. at 876.

In announcing that holding, the Court did not rescind or modify any of the language in its previous cases relating to mandatory death penalty sentences for life term prisoners committing murder. This Court therefore concludes that the question reserved in the footnotes to those cases is still open, and that the holding in *Eddings* is limited to discretionary death penalty cases. Indeed, as noted before, that question has never been ruled on by the Supreme Court.

## 2. *Jury Nullification Claim*

 Petitioner's second claim (pp. 16–18 of his brief) is that § 319 creates a real danger of jury nullification because the jury may confuse considerations of guilt with considerations of sentencing. He argues that jurors who know that a guilty verdict compels the death sentence cannot be expected to discriminate between the different criteria required for a finding of guilty and for a determination of an appropriate sentence. Jury determinations of guilt, he asserts, based on factors unrelat-

---

**10.** The distinction between first and second degree murder was abolished and various elements of the homicide offense were altered when Alabama's new criminal code went into effect on January 1, 1980. *See Code of Alabama 1975,* §§ 13A–6–1 through 13A–6–4. That change, however, has no effect on the present case, because § 319 was repealed effective that same date. The law stated in the text, above, was the law in effect while § 319 was in operation.

ed to evidence of guilt are arbitrary and capricious in violation of the Eighth and Fourteenth Amendments, and destroy the reasonable basis of the criminal justice system. See *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); *Roberts (Stanislaus) v. Louisiana*, 428 U.S. at 335, 96 S.Ct. at 3007; and *Woodson v. North Carolina*, 428 U.S. at 302–303, 96 S.Ct. at 2990 (Stewart, J.). Upon review of this claim, the Court concludes that it has no merit.

The decisions in *Woodson v. North Carolina*, and *Roberts (Stanislaus) v. Louisiana, supra*, were in part concerned with the issue of jury nullification; however, neither the reasoning nor the historical evidence relied on those occasions helps this petitioner.

In *Woodson* the United States Supreme Court relied on historical evidence dating back to colonial times, which indicated that general mandatory death penalty statutes had resulted in a significant amount of jury nullification. *Woodson v. North Carolina*, 428 U.S. at 289–295, 302–303, 96 S.Ct. at 2990. A study from North Carolina established that under an earlier mandatory statute applicable to all rapes and to all first degree murders in that state, juries had "quite frequently" rendered verdicts "acquitting" defendants of those offenses despite clear evidence of guilt, apparently because the jury did not feel that death was a proper sentence in that particular rape or murder case. *Id.* at 299–300, 302, 96 S.Ct. at 2988–2989, 2990. The Supreme Court reasoned that such jury behavior was likely to continue, because a statute imposing the death penalty for every crime in such a broad category as murder did not take into account relevant aspects of the offender's prior record and character. *Id.,* at 299–305, 96 S.Ct. at 2988–2991. The same evidence and reasoning was applied in *Roberts (Stanislaus) v. Louisiana, supra.* Even though the Offense in that case was narrowed somewhat, it still was not defined in terms of the offender's prior record and character. Accordingly, the result reached was the same as in *Woodson v. North Carolina.*

The present case is different in at least two important aspects. First, there is absolutely no evidence that there has been any, let alone a significant amount of, jury nullification under § 319 or any mandatory statute like it which is so narrowly defined in terms of the murderer's prior record and character. Indeed, the statistics cited on p. 28 of the petitioner's brief establish that there has been no jury nullification at all under § 319. The burden of proof on this and all issues is on the habeas petitioner. *Rose v. Mitchell*, 443 U.S. 545, 564–565, 99 S.Ct. 2993, 3004, 61 L.Ed.2d 739 (1979); *Ross v. Hopper*, 716 F.2d 1528, 1539 (11th Cir.1983) (capital case); *Douglas v. Wainwright*, 714 F.2d 1532, 1543 n. 10 (11th Cir.1983) (capital case). Therefore, the burden is on petitioner to bring forth some proof that guilty defendants have been acquitted under § 319 despite clear evidence of their guilt, or at the very least that there has been a suspiciously high number of acquittals under § 319. Thigpen has failed to carry that burden, as he has not been able to point to a single acquittal under § 319, much less to an unjustified acquittal.

The Supreme Court cases concerning nullification are also inapplicable to this case. While it is understandable that juries might hesitate to convict under a general mandatory statute in some circumstances, it is not reasonable to assume that juries would be hesitant about convicting a guilty first degree murderer who committed the murder while he was under sentence of life imprisonment for an earlier very serious crime. Indeed, the unreasonableness of such an assumption and the lack of any evidence to support it is what prompted the Supreme Court to except from its holding in the mandatory statute cases provisions like § 319 in which the crime is "defined in large part in terms of the character and record of the offender". *Woodson v. North Carolina*, 428 U.S. at 287, n. 7, 96 S.Ct. at 2983, n. 7; *Accord, id.* at 292 n. 25, 2985; *Roberts (Stanislaus) v. Louisiana*, 428 U.S. at 334 n. 9, 96 S.Ct. at 3006 n. 9; *Roberts (Harry) v. Louisiana*, 431 U.S.

633, 637 n. 5, 97 S.Ct. 1993, 1995 n. 5, 52 L.Ed.2d 637 (1977).

It is important not to lose sight of exactly what is being discussed on the issue of jury nullification. In this instance, the petitioner is asking this Court to strike down the statute under which he was tried and sentenced because it created a risk that he and others tried under it would be improperly acquitted. Absent some evidence that erroneous acquittals actually occurred in some other cases, this Court believes that a defendant should not be heard to complain that the jury which convicted him was improperly pressured to acquit him.

The petitioner's arguments that the mandatory nature of the penalty under § 319 could lead to improper convictions are not persuasive. His argument that the mandatory penalty might somehow lead to a conviction based on jury confusion is unsupported by any reasoning or evidence, and is based on the assumption that jurors do not follow their instructions. Similarly, the petitioner's argument that the jury might improperly convict a defendant of the capital offense rather than of a lesser offense in order to impose the death sentence is based on an unacceptable view of the character and morals of jurors. In addition, this same argument would apply to non-mandatory punishment statutes under the bifurcated proceedings prevalent today. When reaching its guilt verdict under such procedures the jury knows that if the defendant is convicted of the capital offense he will be eligible for the death penalty. The jury knows that because every juror will have been subjected to voir dire of the nature involved in *Witherspoon v. Illinois*, 391 U.S. 510, 522–523 n. 21, 88 S.Ct. 1770, 1776–77 n. 21, 20 L.Ed.2d 776 (1968), before he is chosen to sit on a capital jury.

### 3. *Sufficiency of Appellate Review.*

■ Petitioner at pp. 18–19 of his brief claims that § 319 precludes meaningful appellate review, which is necessary to insure a reliable sentence. See *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 2744, 2749, 77 L.Ed.2d 235 (1983); *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 3426, 77 L.Ed.2d 1134 (1983). The Court finds no merit to this claim.

Under Alabama law and practice concerning § 319, the Alabama appellate courts did review the propriety of the death sentence when the defendant suggested on appeal that it was disproportionate or arbitrary. An example of the type of review available is contained in *Harris v. State*, 352 So.2d 479, 485 (Ala.1977). That the appellate opinions affirming Thigpen's conviction and sentence do not contain an express review of the propriety of the death sentence in this case merely reflects the fact that Thigpen on direct appeal did not even argue that his sentence was disproportionate or arbitrary under the facts of this case. See *Thigpen v. State*, 355 So.2d 392 (Ala.Crim.App.), *aff'd*, 355 So.2d 400 (Ala.1978); see also Exhibits C through H of the answer (the briefs filed in Thigpen's direct appeal).

Insofar as the petitioner contends that comparative proportionality review, which he did not request, is required, that contention is foreclosed by *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). The Alabama appellate court conducted prompt, automatic review of § 319 cases, which was held sufficient in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and even more appellate review was available to any § 319 defendant who requested it.

Accordingly, this Court concludes that adequate appellate relief was available, but petitioner failed to raise the question of disproportionality on direct appeal.

### 4. *Does § 319 Offend Fundamental Societal Values?*

Petitioner's fourth claim is that § 319 offends fundamental societal values. See *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). He points out that few jurisdictions have had mandatory death sentences, and that all have been repealed, or have been found to be unconstitutional or have been judicially rewritten. He further points out that § 319 was repealed by the State of Alabama, and

that said repeal is a clear indication that § 319 "fails to fit within the framework of the state's values." Pet. Brief at 19.

■ This claim is weak for at least two reasons. First, in a recent case, *Spaziano v. Florida,* — U.S. —, 104 S.Ct. 3154, 3164–65, 82 L.Ed.2d 340, 354–55 (1984), the Supreme Court held that the mere fact that a substantial majority of jurisdictions had adopted a different practice than the State of Florida in determining whether a defendant should be sentenced to death failed to establish that "contemporary standards of decency [were] offended by" Florida's jury override. The Court went on to say the "Eighth Amendment is not violated every time a state reaches a conclusion different from a majority of its sisters over how best to administer its laws." *Id.* — U.S. at —, 104 S.Ct. at 3165, 82 L.Ed.2d at 355. Thus, § 319 is not unconstitutional because only a few other states have had mandatory death sentences. Although judgment by "legislators, juries, and prosecutors weigh heavily in the balance," the determination of constitutionality is ultimately to be made by a judge. *Spaziano v. Florida,* — U.S. at —, 104 S.Ct. at 3165, 82 L.Ed.2d at 355. Thus, the "societal values" argument appears to have lost considerable persuasive effect under the *Spaziano* decision.[11]

■ Secondly, the State argues persuasively that the legislature's repeal of § 319 resulted from confusion over what constituted a constitutional death penalty statute, rather than any determination that the statute offended Alabama's fundamental societal values.

The State first points out that § 319 was repealed as it applied to cases appearing after January 1, 1980. Section 9901, Act No. 607, Alabama Acts of 1977, p. 914.[12] The State further argues that the repeal of § 319 hardly demonstrates beyond peradventure that the reason for the repeal was that Alabamians, through their legislators, disfavored § 319. Instead, the State urges, the legislative action simply reflects the uncertainty engendered by the *Furman* decision and its 1976 progeny.

For example, as late as 1978, Chief Justice Burger, speaking for four members of the Court, was compelled to admit that while states had made sincere attempts to comply with *Furman* and its progeny, "[t]he signals from this Court have not, however, always been easy to decipher." *Lockett v. Ohio,* 438 U.S. at 602, 98 S.Ct. at 2963. Another member of the United States Supreme Court put it more bluntly, stating that the Court had gone "from pillar to post" failing to announce any "coherent doctrine" in this area of the law. *Id.,* at 629, 98 S.Ct. at 2973, (Rehnquist, J., concurring in part and dissenting in part). A number of lower courts have been even less kind, one pointing out that the Supreme Court's uneven performance in this

---

**11.** The focus of petitioner's argument, that a nose count of state practices should be determinant of whether a statute is constitutional, violates traditional notions of federalism. *Rummel v. Estelle,* 445 U.S. 263, 282, 100 S.Ct. 1133, 1143, 63 L.Ed.2d 382 (1983); *Addington v. Texas,* 441 U.S. 418, 431, 99 S.Ct. 1804, 1812, 60 L.Ed.2d 323 (1979). The Supreme Court has on numerous instances upheld unique state practices or statutes. *E.g. Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (shifting of burden of proving insanity to the defendant); *Williams v. Florida,* 399 U.S. 78, 103 & n. 50, 136–137, 90 S.Ct. 1893, 1907 & n. 50, 1925, 26 L.Ed.2d 446 (Harlan, J. dissenting in part and concurring in part) (1970) (6 member juries constitutional in all felony cases except capital crimes); *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (9–3 vote of jury establishing guilt in criminal case is constitutional). And in capital cases see *Zant v. Ste-*

*phens,* 456 U.S. 410, 423, n. 2, 102 S.Ct. 1856, 1862, n. 2, 72 L.Ed.2d 222 (1982) (certification order) (Georgia practice allowing death sentence to stand where invalid circumstance considered left standing despite contrary practice of most other states); *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (California practice of instructing jurors that life sentence might be commuted left standing despite its uniqueness.)

**12.** Act No. 607 was the new criminal code. Its effective date was postponed by the Legislature a number of times, until it finally went into effect on January 1, 1980. *See* Ala.Code § 13A–1–11 (1975). Not until the provisions of the new criminal code took effect did the repealer sections take effect. Therefore, the effective date of the repealer of § 319 was January 1, 1980.

area of the law had reduced attempts to enact a valid law to a mere guessing game—the states that guessed right had their capital punishment statutes upheld, those that guessed wrong had theirs struck down. *Beck v. State,* 396 So.2d at 656–657.

In the confusion created by the United States Supreme Court's decisions in the area of capital punishment, the best way for a state to increase its chances of having a statute upheld, according to the State's argument, was to steer towards those statutes that had been upheld and away from any provisions whose validity was still open to question. In 1976 the Supreme Court implied in *Woodson* and the two *Roberts* decisions that a mandatory death sentence for a life sentence inmate would probably be constitutional, but did not enter a holding to that effect. Accordingly, when the State argues the Legislature passed the 1977 legislation which repealed § 319 in order to steer away from any open question and toward what it thought was safer constitutional waters, that argument makes sense.

Significantly, the Alabama Legislature's repeal of § 319 would no more prove that the people of Alabama disapproved of such statutes than the enactment of general mandatory statutes in ten states following *Furman* proved that the people of those states preferred mandatory to discretionary statutes for broad categories of capital offenses. Instead, as the Supreme Court pointed out later, that action merely reflected an attempt, an unsuccessful one, to guess right about where the United States Supreme Court was headed in this area of the law. *See, Woodson v. North Carolina,* 428 U.S. at 299 n. 35, 96 S.Ct. at 2988 n. 35 (joint plurality opinion of Stewart, Powell and Stevens, JJ.).

Perhaps even more significant is that the Legislature left § 319 in place insofar as it applied to crimes already committed. *See,* Ala.Code §§ 13A–1–7(c), 13A–1–10 (1975). If the Legislature had not chosen to do so, this case would not be before this Court. Thus, to contend, as Thigpen does, that the Legislature repealed § 319 for future purposes because it concluded that a mandatory death sentence for murder committed

during a life sentence is unjust or unconstitutional, is also to contend that the Legislature left § 319 in effect as it applied to existing cases even though the Legislature thought it was unjust and unconstitutional to do so. This is a difficult argument to buy.

The better explanation for the legislative action appears to be that the Alabama Legislature felt § 319 was entirely just and proper, but was uncertain that the United States Supreme Court would agree at some future date. Accordingly, the Legislature apparently hedged its bets. It left the statute in effect as to all crimes already committed and took what it felt would probably be a safer course, but not necessarily a more just course, for future crimes.

In weighing the arguments of the parties, the Court concludes that the petitioner has failed to meet its burden in establishing that § 319 offends societal values, and more specifically that the Alabama Legislature repealed § 319 because it believed that statute offended Alabama's fundamental societal values.

### 5. *Is § 319 Penologically Justified?*

■ Petitioner at pp. 22–25 of his brief argues that the imposition of the death penalty under § 319 constitutes constitutionally excessive punishment imposed without penological justification. The thrust of his arguments, if accepted, means that capital punishment is unconstitutional per se regardless of the procedure employed. At least since 1976, however, a majority of the Supreme Court has refused to hold that capital punishment itself violated the Eighth and Fourteenth Amendments. *E.g., Gregg v. Georgia,* 428 U.S. 153, 168–187, 96 S.Ct. 2909, 2922–31, 49 L.Ed.2d 859 (1976) (joint plurality opinion of Stewart, Powell and Stevens, JJ.); *Id.* at 226, 96 S.Ct. at 2949 (concurring opinion of White, J., joined by Burger, C.J., and Rehnquist, J.); *Id.* at 227, 96 S.Ct. at 2950 (concurring opinion of Blackmun, J.).

For example, at pp. 23–24 of his brief, the petitioner argues that § 319 must be

struck down because the State has not proven that execution pursuant to § 319 serves to deter murders by life sentence inmates. That proposition has been rejected by the Supreme Court which has repeatedly upheld capital punishment in general despite what it has called "inconclusive" attempts to determine whether capital punishment deters further murders. *Gregg v. Georgia*, 428 U.S. at 184–185, 96 S.Ct. at 2930 (joint plurality opinion of Stewart, Powell and Stevens, JJ.). The United States Supreme Court has at the very least put the burden of persuasion on the deterrence issue on the opponents of capital punishment, and that burden is particularly apt in a habeas proceeding such as this one in which the burden of proof is already on the petitioner to prove every element of his case.

The petitioner has produced no evidence to prove that § 319 does not deter murders by life sentence inmates better than a discretionary statute does. Petitioner's suggestion that "murders by life term prisoners occur with the same frequency in states with discretionary death penalties, or even with no death penalty, as in states with mandatory death penalties" (petitioner's brief at p. 24) is insufficient even if true. There is no proof, indeed there can be none, of what the rate of murder by life sentence inmates would have been in those states with mandatory death penalties had those mandatory penalties not existed. There are too many variables to assume that every state can be treated alike for such purposes. In addition, petitioner's argument would prove too much. If such studies are constitutionally significant, then no state may punish murder committed by a life sentence inmate with death regardless of the procedure employed, because according to the petitioner the rate of such murders is the same even with no death penalty.

Apart from the issues of deterrence, § 319 is constitutionally legitimate for other reasons. The Supreme Court has recognized, "certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death." *Gregg v. Georgia*, 428 U.S. at 184, 96 S.Ct. at 2930 (joint plurality opinion of Stewart, Powell and Stevens, JJ.). The United States Supreme Court has also recognized that while mandatory statutes are not justified in most situations, "a prisoner serving a life sentence presents a unique problem that may justify such a law." *Roberts (Stanislaus) v. Louisiana*, 428 U.S. at 334 n. 9, 96 S.Ct. at 3006 n. 9 (joint plurality opinion of Stewart, Powell and Stevens, JJ.). First degree murder committed by an inmate serving a life sentence, particularly in a case like this one where the petitioner has already been convicted of first degree murder, presents a unique problem justifying a mandatory law because there is nothing else to do with such a prisoner who commits a murder. If he is not sentenced to death, his second murder and all that follow thereafter are "free", they cost him nothing and there is no reason for him not to commit them.

The petitioner's argument that various sanctions short of death suffice in such a situation is wholly without merit. No postponement of parole eligibility is likely to serve as punishment for one with little or no prospects of parole anyway. The petitioner in a footnote on pp. 24–25 of his brief contends that:

> [E]ven persons serving life sentences have something other than their lives to lose. All life prisoners have the possibility of parole and even in those states in which a defendant can be sentenced to life imprisonment without the possibility of parole, such a defendant can still receive a commutation. Thus, a mandatory death sentence is not necessary because even a life prisoner has "something to lose"—the possibility of eventual freedom—if he or she commits a murder while in prison. . . .

That statement itself demonstrates the justification for statutes such as § 319. If, as the petitioner maintains, there is really no such thing as life without parole and every prisoner has some hope of commutation and release no matter what crimes he commits, then death is the only punishment society can inflict which will cause any real and certain loss to the life sentence inmate.

A second, third, or additional life sentence will not remove the hope of ultimate freedom. Only death will.

Thigpen's argument in the same footnote that a life sentence inmate who murders can be punished by segregation, denial of visitation rights, and forced labor is equally without merit. Assuming that such an idea could survive the flood of petitions under 42 U.S.C. § 1983 that it would provoke, the petitioner does not address the question of how to force an unwilling inmate who is already serving one or more life sentences to perform hard labor. Nor does that argument address the more fundamental question of what to do with such a life sentence inmate who has been segregated, denied visitation rights, and forced to perform hard labor because of a second murder when he commits yet another murder.

Retribution is not a forbidden objective of our criminal law, *Gregg v. Georgia*, 428 U.S. at 183, 96 S.Ct. at 2929 (joint plurality opinion of Stewart, Powell and Stevens, JJ.), and the only way to advance that objective in the case of life sentence inmates is through a death sentence. Therefore, a mandatory death sentence is the only answer to the "unique problem" the United States Supreme Court discussed in *Roberts (Stanislaus) v. Louisiana, supra.*

A mandatory death sentence is also justified in such a situation by special considerations of specific deterrence. An excellent summation of the specific deterrence rationale is, "[a]side from the deterrent effect capital punishment may have on future criminals, it can be said with certainty that execution deters, for all time, the criminal conduct of the person against whom it is imposed." *Jacobs v. State*, 361 So.2d 607, 637 (Ala.Crim.App.1977) (concurring opinion of Bookout, J.), *aff'd*, 361 So.2d 640 (Ala.1978), *cert denied*, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979). The significance of the specific deterrence rationale underlying § 319 is most aptly illustrat-

ed by this case in which the petitioner has brutally murdered two helpless victims: a young mother shotgunned to death and an elderly farmer bludgeoned to death.

As previously noted the petitioner was sentenced to death in 1972 for shotgunning his common law wife to death in front of a young child. In 1973 his death sentence was changed to life imprisonment because of the *Furman* decision. The petitioner, having been granted a reprieve from his death sentence, then escaped from prison and murdered Henry Lambeth. Regardless of whether the petitioner's execution might deter some other criminal from committing murder, it can be assured that it will prevent the petitioner from murdering again. Indeed, given his prior actions and the nature of his personality indicated by the two brutal murders which he has committed, it appears as though execution is the only way to prevent him from murdering again.[13]

The Court having reviewed the petitioner's five arguments on the asserted constitutional invalidity of § 319, concludes that the statute is constitutional. In the alternative the Court also holds that petitioner has failed to demonstrate any prejudice from the statute's allegedly unconstitutional aspects.

### 6. General Application of Death Penalty in Alabama

In claim 6 (¶¶ 36–38 of his petition and pp. 33–35 of his brief) the petitioner, who is Black, argues that he was sentenced to death in violation of the Eighth and Fourteenth Amendments to the United States Constitution because the death penalty has historically been applied in a racially discriminatory manner in Alabama. This claim is procedurally barred. Petitioner failed to raise this claim either at trial or on appeal. Under Alabama law, the failure to raise that issue at trial violated the

---

**13.** The penological justification for § 319 is also illustrated by the case of Johnny Harris. In affirming the constitutionality of § 319 in his case, the Alabama Supreme Court noted that at the time Harris murdered a prison guard during a riot he was already serving five life sentences and was in punitive segregation in a maximum security prison. *Harris v. State,* 352 So.2d 479, 484–485 (Ala.1979).

State's contemporaneous objection rule and barred consideration of the issue on appeal. See e.g. *Walker v. State*, 416 So.2d 1083, 1097 (Ala.Crim.App.), *cert. denied*, No. 81–173 (Ala.1982); *Wood v. State*, 416 So.2d 794, 799 (Ala.Crim.App.1982); *Moore v. State*, 415 So.2d 1210, 1217 (Ala.Crim.App. 1982).

██ Therefore, under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) and *Engle v. Issac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), petitioner is barred from raising this issue in a habeas proceeding, absent a showing of adequate cause and actual prejudice. Thigpen has done neither. The holdings of *Wainwright v. Sykes* and *Engle v. Issac, supra,* apply in death penalty cases in this Circuit. *Smith v. Kemp*, 715 F.2d 1459, 1469–1472 (11th Cir.1983); *Sullivan v. Wainwright*, 695 F.2d 1306, 1310–1312 (11th Cir.1983); *Goode v. Wainwright*, 704 F.2d 593, 601–602 (11th Cir. 1983), *rev'd on other grounds*, 464 U.S. 78, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983) (per curiam).[14] Accordingly, the Court concludes that Thigpen is barred from raising this claim in a habeas proceeding, and the claim is dismissed.

### 7. *Rare and Arbitrary Application of § 319*

The petitioner in paragraphs 26–31 of his petition and on pp. 26–31 of his brief argues that § 319 has been applied in a rare and arbitrary fashion in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Petitioner first raised this issue in a collateral attack during his error coram nobis proceeding. His attorney sought to make an offer of proof at the hearing, but the offer was denied by the State Court. (Escam.Cor.Nob. 163–169, and pp. xiv and vx of Exhibit I to the State's answer.) No request for a hearing on that issue was made to this Court.[15]

██ On appeal from the denial of state collateral relief, the Alabama Court of Criminal Appeals held that the petitioner was procedurally barred from raising this claim because he failed to raise it either at trial or on appeal. Specifically the Alabama Court of Criminal Appeals held:

> The constitutionality of Section 319 was recently upheld in *Harris v. State*, 352 So.2d 460 (Ala.Crim.App.1976), *aff'd*, 352 So.2d 479 (Ala.1977). On direct appeal Thigpen's attorneys did not initially challenge the constitutionality of Section 319. *Thigpen*, 355 So.2d at 395. On rehearing and by direction of this Court the issue of constitutionality was presented. *Thigpen*, 355 So.2d at 399. Now Thigpen, armed with different counsel, seeks to present another reason for declaring Section 319 unconstitutional. Coram nobis does not serve the function of an appeal or a delayed appeal. *Summers v. State*, 366 So.2d 336, 340 (Ala. Crim.App.1978), *cert. denied*, 366 So.2d 346 (Ala.1979). "The writ is appropriate only when the petitioner's claim is based on facts which were not known and could not have been discovered with the exer-

---

**14.** Even if petitioner had raised this claim at trial, it would still be barred because he failed to raise it on appeal. See *Shriner v. Wainwright*, 715 F.2d 1452, 1459 (11th Cir.1983); *King v. Strickland*, 714 F.2d 1481, 1491–1492 (11th Cir.1983); *Ford v. Strickland*, 696 F.2d 804, 816–817 (11th Cir.1983) (en banc). Thigpen could not raise this issue in his coram nobis proceeding. *E.g., Summers v. State*, 366 So.2d 336, 339–340, 343 (Ala.Crim.App.1978), *cert. denied*, 366 So.2d 346 (Ala.1979). (An Alabama state prisoner cannot raise in a collateral attack to his conviction any issue he could have but did not raise on appeal). For the same proposition see *Thigpen v. State*, 374 So.2d at 403.

**15.** As previously noted, in its Order of December 5, 1983, this Court provided: "in the event the parties believe that an evidentiary hearing will be necessary, they are to inform the Court no later than December 19, 1983." Thereafter, neither party requested an evidentiary hearing on this or any other issue. Therefore, the petitioner cannot say that he has been denied a full evidentiary hearing on this or any other issue, nor can he claim that he thought his allegations of fact concerning this issue were undisputed. The State's response vigorously disputed the allegations in the coram nobis proceeding, and denied the truth of those allegations in the answer to Thigpen's petition. (See paragraphs 25–27 and 30 of the answer responding to paragraphs number 26–28 and 31 of the petition). The State's denial of those allegations was specific and emphatic.

cise of reasonable diligence at the time of trial. . . . The writ will not lie where a remedy against the error complained of, though available, was deliberately or negligently not used at the trial that resulted in the judgment of conviction". *Summers*, 366 So.2d at 340. By raising certain challenges to the constitutionality of Section 319 on direct appeal a petitioner is effectively precluded from asserting additional grounds for challenge on a collateral attack of the judgment where the newly asserted grounds could have been discovered with the exercise of reasonable diligence at the time of trial or direct appeal. A defendant should not be permitted to attack an issue in a piecemeal fashion in an effort to suspend indefinitely the execution of judgment.

374 So.2d at 403. Thus, this Court is barred from considering this claim.[16]

■■■■■ The Alabama Court of Criminal Appeals also ruled against the petitioner on the merits. 374 So.2d at 403–404. Ordinarily, if a state appellate court addresses and rejects a claim on the merits that removes any procedural bar to federal habeas review. However, where a state appellate court bases its rejection on both the procedural default and the merits, as alternative or dual grounds of decision, federal habeas courts should and must refuse to review the merits. *E.g., Dobbert v. Strickland*, 718 F.2d 1518, 1524–1525 (11th Cir. 1983) (capital case); *Ratcliff v. Estelle*, 597 F.2d 474 (5th Cir.) *cert. denied*, 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979); *Farmer v. Prast*, 721 F.2d 602, 605–606 (7th Cir.1983). Therefore, under those controlling decisions this Court concludes that petitioner's claim that § 319 has been rarely and arbitrarily applied is barred from habeas review despite the Alabama Court of Criminal Appeals' dual holding on the procedural bar and on the merits.

### 8. *Has § 319 Been Applied in a Discriminatory Fashion?*

■■■■ In paragraphs 33–35 of the petition and on pages pp. 31–33 of his brief, the petitioner claims that § 319 has been applied in a discriminatory fashion. A review of the proof offered by the petitioner indicates that none of the statistics he has proffered supports his claim, and in fact if the statistics have any meaning at all they disprove that claim.

According to his brief, 69% of the inmates serving life sentences in Alabama's prisons have been Black, yet only 60% of those known to have been prosecuted under § 319 have been Black. Those statistics would seem to mean that § 319 has not been discriminatorily applied to Blacks, unless it is established that White inmates serving life sentences commit substantially more first degree murders than Black inmates serving life sentences. The petitioner has not so suggested, and there is no evidence indicating that to be true. It thus appears as though the statistics that the petitioner relies on actually disprove his claim.

The petitioner also seeks to prove that § 319 has been discriminatorily applied to the eligible inmate population. On page 32 of his brief he argues that the discrimination has actually occurred one step back, in the process leading to the makeup of the eligible population. He states that 69% of the inmates serving life sentences between 1961 and 1975 were Black (Escam.Cor.Nob. Ex. No. 16, Vol. I, 125–127), which he claims means that racial discrimination occurred in non-capital sentencing resulting in the eligible pool of life sentence inmates. Nevertheless, there appears to be no evidence presented at the coram nobis hearing which establishes that Blacks were sentenced to life terms disproportionately more than Whites for the same crimes. The problem with petitioner's argument is that there is no proof that Whites and Blacks commit serious crimes at the same rate.

The State argues that the Justice Department's recently released *Report to the Nation on Crime and Justice* (Oct.1983) indicates that while Blacks constituted only 12% of the United States population they constituted 46% of the serious crime arres-

---

**16.** See section IIE6 of this opinion.

tees, *id.* at 31–36. Thus, the ratio of the proportion of serious crime (or at least arrestees for serious crime) to proportion of the Black population is nearly 4–1 (46% to 12%), according to Justice Department statistics. Yet the ratio of the proportion of Blacks serving life sentences in Alabama to the proportion of Blacks in Alabama's population is only about two and one-half to one (69% to 30%), according to the petitioner's statistics. Although the statistics cited by the State do not directly apply, the available evidence presented to the Court tends to infer, although weakly, that Blacks have not been disproportionately sentenced to life prison terms in Alabama, when their higher rate of serious crime is considered. At any rate the petitioner has failed to prove his claim by a preponderance of the evidence.

▇▇ If any additional evidence is needed so that other variables can be considered and explored, the burden to provide that evidence is on the petitioner. It is a cardinal principle of habeas law that the burden of proof is on the habeas petitioner. *E.g., Rose v. Mitchell,* 443 U.S. at 564–565, 99 S.Ct. at 3004; *Ross v. Hopper,* 716 F.2d at 1539; *Douglas v. Wainwright,* 714 F.2d at 1543 n. 10. That means that a habeas petitioner offering statistical evidence has the burden of refining his data so that it is free of assumptions unsupported by the evidence, so that his chain of reasoning is free of illogical "leaps" and so that he proves rather than merely suggests his conclusion. *E.g., Smith v. Balkcom,* 660 F.2d 573, 584–585 (5th Cir. Unit B 1981) *modified on rehearing,* 671 F.2d 858 (1982) *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982); *Spinkellink v. Wainwright,* 578 F.2d 582, 612–616 (5th Cir. 1978). The petitioner in this case has utterly failed to meet that burden.

Finally, Thigpen's speculation that he might have been able to prove his claim if the State had granted him funds to pursue his theories in the coram nobis proceeding is unfounded. The Eleventh Circuit has held that a State has no constitutional obligation to furnish financial assistance to a petitioner in a state collateral proceeding.

*Willis v. Zant,* 720 F.2d 1212, 1215 n. 5 (11th Cir.1983) (capital case).

### 9. *Disproportionality of Sentence.*

Petitioner's final argument is that his death sentence was unconstitutionally disproportionate to what he alleges was his "relatively minor" involvement in the crime. (See Thigpen's brief at pp. 35–40) In determining whether a defendant may constitutionally be sentenced to death, "the focus must be on [the petitioner's] culpability ... for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence.'" *Enmund v. Florida,* 458 U.S. 782, 789, 102 S.Ct. 3368, 3372, 73 L.Ed.2d 1140 *quoting Lockett v. Ohio,* 438 U.S. at 605, 98 S.Ct. at 2965. Thus, in determining whether a defendant may be sentenced to death, it is incumbent to determine from the record whether the defendant intended to kill, attempted to kill, or had in some other fashion the constitutionally required intent to kill.

▇▇ Thigpen also appears to claim that his sentence should have received a proportionality review. *See Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). That type of review is now required under Alabama law, Ala.Code § 13A–5–53(b)(3) (1975). It was not required at the time of Thigpen's conviction, and is not constitutionally required. *Pulley v. Harris,* 104 S.Ct. at 881.

Petitioner's claim that he did not have the requisite intent to kill is based upon his own interpretation of the facts and a rejection of the jury's verdict. He argues that his testimony, along with that of Pedro Williams, established that Williams and not Thigpen killed Henry Lambeth. First, this argument fails in light of other evidence presented at trial. The State presented testimony indicating that blood on the defendant's clothing matched the same blood type as the victim. The State also presented evidence impeaching Williams' testimony by two prior inconsistent statements in which Williams asserted Thigpen killed Henry Lambeth. There was also Thigpen's

letter urging Williams to recant his prior statements, and to remember their friendship. At the time that Williams took the stand, he had already pled guilty, had been sentenced, and had nothing to lose by changing his story.

The jury was charged that Thigpen could be convicted of first degree murder if and only if it found beyond a reasonable doubt that Thigpen has willfully, maliciously, and with deliberation and premeditation killed Henry Lambeth. The elements of first degree murder were defined and the jury was instructed that all of the elements must exist together. The jury was instructed as to second degree murder, and that if there was any reasonable doubt as to whether Thigpen had acted willfully or had premeditated and deliberated the killing, he could only be convicted of second degree murder. (Escam. Tr. Vol. II, 158–159) The trial court also instructed the jury on the aiding and abetting doctrine, but those instructions did not permit the jury to convict Thigpen of first degree murder unless it found beyond a reasonable doubt that he intentionally killed the victim himself, or that he intentionally entered into a common enterprise or adventure to kill the victim, or that he intentionally aided and abetted the killing. (*Id.* at 158–161, 166) Other charges read to the jury included the following charges requested by Thigpen:

> Murder in the Second Degree is the unlawful killing of another with malice aforethought, without the premeditation and deliberation of Murder in the First Degree. The law does not countenance the conviction of any person for an offense not contemplated, intended, or committed by him, and of which he had no knowledge that the offense was about to be committed.

> It is for you the jury to decide, however, from all of the evidence, first, whether Donald Thigpen participated in the alleged killing, and, if so, whether he did so knowingly and with knowledge of its purpose. (Escam. Tr., Vol. II, 166) *Thigpen v. State*, 355 So.2d at 399.

Under its instructions, the jury could have only convicted Thigpen of first degree murder if it found beyond a reasonable doubt that he personally intentionally killed Mr. Lambeth, or that he intentionally entered into a common enterprise with Williams to kill Mr. Lambeth, or that he intentionally aided and abetted Williams in the act of killing Mr. Lambeth. Pursuant to its instructions, the jury would have convicted Thigpen only of second degree murder or would have acquitted him altogether if it believed any part of Thigpen's contentions about his role in the killing, or if it believed Williams' testimony at trial rather than his prior inconsistent statements, or if the jury had any kind of reasonable doubt about the matter.

One of the most important principles of our criminal justice system is the crucial presumption that juries follow their instructions. *E.g., Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 853 n. 6, 74 L.Ed.2d 646 (1983); *Parker v. Randolph,* 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979); *Shriner v. Wainwright, supra,* 715 F.2d at 1459; *Adams v. Wainwright,* 709 F.2d 1443, 1447 (11th Cir. 1983). For that reason, the United States Supreme Court has repeatedly admonished lower courts that they should not assume that juries disobeyed their instructions. *Pulley v. Harris,* 104 S.Ct. at 879 n. 10; *Jurek v. Texas, supra,* 428 U.S. at 279, 96 S.Ct. at 2959 (concurring opinion of White, J., joined by Burger, C.J., and Rhenquist, J.).

In view of the instructions given the jury, implicit in its verdict convicting Thigpen of first degree murder are fact findings rejecting Thigpen's contentions that he played only a relatively minor role in the killing and did not actively participate in it. The jury heard all the evidence Thigpen bases his contentions on, and it found the evidence unworthy of belief. Under those circumstances, and given the admonitions of the Supreme Court as to jury instructions and as to presumptions about obeying those instructions, this Court sees no reason to conclude that the petitioner's participation in this crime was "insignificant". Accordingly, the Court concludes that petitioner's sentence of

death was not disproportionate to the role he played in the crime.

### F. The Constitutionality of § 319 is Supported by the Better Reasoned Precedent

The precedents concerning the facial validity of statutes like § 319 are divided. On the one hand there are *Shuman v. Wolff*, 571 F.Supp. 213 (D.C.Nev.1983), *appeal pending*, Docket No. 83–2459 (9th Cir.), and *People v. Smith*, 63 N.Y.2d 41, 479 N.Y.S.2d 706, 468 N.E.2d 879 (Ct.App. 1984), *cert. denied*, —— U.S. ——, ——, 105 S.Ct. 1226, ——, 84 L.Ed.2d 364 (1985) [17] which favor Thigpen.[18] On the other hand, there are the decisions of the Alabama Supreme Court in *Harris v. State*, 352 So.2d 479 (Ala.1977),[19] and *Thigpen v. State*, 355 So.2d 392, 398–400 (Ala.Crim. App.) (on rehearing), *aff'd*, 355 So.2d 400 (Ala.1977) (per curiam), which favor the State.

Those opinions holding that § 319 type statutes are unconstitutional tend to emphasize: 1. That such statutes preclude the presentation of mitigating evidence and therefore do not provide for sufficient individualized consideration of the defendant. See *e.g., Graham v. Superior Court*, 116 Cal.Rptr. at 13; *Shuman v. Wolff*, 571 F.Supp. at 216; *State v. Cline*, 397 A.2d at 311; *Harris v. State*, 352 So.2d at 487 (Torbert, C.J., dissenting); *People v. Smith*, 479 N.Y.S.2d at 722–725, 468 N.E.2d 879; or 2. Such statutes are of questionable deterrent value and thus not justified, *Graham v. Superior Court*, 160

Cal.Rptr. at 14; *People v. Smith*, 479 N.Y. S.2d at 723–725, 468 N.E.2d 879.

The opinions holding in favor of § 319 type statutes emphasize the extremely narrow category of murder defined by the statute: a defendant defined largely by his personal characteristics, that is, one who has committed a crime so serious as to have been sentenced to life in prison, and who has also committed first degree murder. *People v. Smith*, 479 N.Y.S.2d at 726–733, 468 N.E.2d 879 (Simmons, J., dissenting) and *Harris v. State* and *Thigpen v. State, supra.*[20] Opinions supporting § 319 also argue that other due process requirements and the lack of proof of other statutory defenses effectively establish the requisite aggravating factors and effectively disprove any significant mitigating factors. See *People v. Smith*, 479 N.Y.S.2d 726–733, 468 N.E.2d 879 (Simmons, J., dissenting). This approach effectively establishes to this Court's satisfaction that § 319 type statutes by their definition meet the criteria of not imposing death "freakishly".

But in reviewing the Supreme Court's footnotes relating to mandatory death sentences for life term prisoners, see Section IIC of this opinion, it is apparent that various members of the Supreme Court did more than indicate that § 319 type statutes might be constitutional because the definition of the crime included virtually all of the relevant sentencing characteristics of a defendant. The Court also appeared to be strongly hinting that the combination of crime and character of the defendant con-

---

**17.** But see the excellent dissents by Simmons, J., 479 N.Y.S.2d at 726–733, and Cook, C.J., *Id.* at 733–735.

**18.** *State v. Cline*, 121 R.I. 299, 397 A.2d 1309 (1979), is distinguishable because the statute struck down in that case applied to every inmate who committed murder regardless of the sentence he was serving. *Graham v. Superior Court*, 98 Cal.App.3d 880, 160 Cal.Rptr. 10 (1979), is distinguishable both because the statute involved in that case applied to all assaults resulting in death and because under California's indeterminate sentencing statute a "life" sentence applied to most California inmates because they were sentenced to an indeterminate "life" sentence.

**19.** Following his conviction and the affirmance of his sentence by the Alabama Supreme Court, Harris was successful in obtaining a vacating of his conviction in an error coram nobis proceeding because of a violation of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). Harris has since been retried under § 319, and his conviction and death sentence from that retrial are now on appeal in the Alabama appellate court system.

**20.** Although not dealing with the facial validity of the statute, within the context of a habeas petition requiring facial invalidity and prejudice, it must be remembered that Thigpen is not only a life term prisoner, but one who previously committed another brutal murder.

victed under § 319 type statutes constituted an exception to the standards set out in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and its progeny. That point was aptly made by Chief Judge Cooke of the New York Court of Appeals when he referred to the holding in *Eddings v. Oklahoma,* 455 U.S. at 110, 102 S.Ct. at 874 (any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death must be considered). Judge Cooke said, "There is a legitimate exception to this general rule which is embodied in the New York statute." 479 N.Y.S.2d at 734, 468 N.E.2d 879. And that exception was embodied in a statute which referred to "an extremely narrow category of homicide, such as murder by a prisoner serving a life sentence, defined in large part in terms of the character or record of the offender." Similar reasoning was employed by the Alabama Supreme Court. That Court held that the Constitution did not require that the defendant be permitted to offer mitigating circumstances when the capital offense was so narrowly defined in terms of the character and record of the murderer as it was in § 319. Nonetheless the Court did note that any substantial mitigation would be presented to and decided by the jury in the course of the factual determination of whether the § 319 defendant was guilty of any lesser included offense or had some defense to the capital charge. 352 So.2d at 483–484.

However, the Court's primary basis for upholding § 319 is the following reasoning:

The Supreme Court of the United States has recognized the unique nature of statutes providing for the mandatory death penalty for life-term prisoners found guilty of murder and has been explicit in noting that it did not intend to pass on the validity of such statute when addressing those statutes of a different nature which were before the court in *Gregg, Woodson, Stanislaus Roberts,* and *Harry Roberts.*

Quite simply, sentencing statutes of the nature of Section 319 are *unique for they fulfill an otherwise unfulfillable public need:* assurance that an otherwise unpunishable life-termer who commits a heinous crime of first degree murder shall not go unpunished. In this respect these statutes differ fundamentally from other statutes which provide the mandatory death penalty for specific crimes. The latter category has undergone changes in every state to meet evolving contemporary standards of decency.

The statutes struck down, that permitted imposition of the death penalty, were invalidated on the basis they were either torturous, or out of proportion to the enormity of the offense, or were freakishly, or capriciously and arbitrarily imposed.... In *Stanislaus Roberts* and *Woodson* the court found that contemporary standards of decency applied through the Eighth Amendment for bad imposition of a mandatory death penalty when no discretion was invested in the sentencing authority to impose an individualized sentence: punishment should be imposed according to the nature of the offense and the character of the offender; allowing the sentencer to determine the extent of punishment appropriate to the circumstances of the particular case.

Section 319 takes cognizance that a life-termer committing first degree murder can be punished by no other means than forfeiture of his or her life. Old as it may be, Section 319 applies a penalty that is acceptable to contemporary social standards and comports with contemporary concepts of the dignity of man. Likewise it does not impose a punishment disproportionate to the crime. Contemporary social standards, seemingly, do not find acceptable an imposition of the ultimate punishment *unless there is no alternative.*

Put simply, is continued incarceration an alternative when one is already incarcerated, serving five life-term sentences, in punitive segregation, in a maximum security prison and there commits murder in the first degree? We think not. Does death by electrocution for such an

**1546**

offender accord the dignity to man which society requires? We think so. Executed privately, afforded priest, rabbi or minister, escorted solemnly to meet his or her maker, is certainly a dignified and humane way as possible to accomplish the demands of society and those circumstances, as here, where life must be forfeited as retribution for, and in deterrence of, the wanton, brutish taking of the life of another. Nothing else could be proportionate to the offense committed by an offender of the character defined in the statute. Section 319, for the reasons enunciated, does not permit a variety of possible offenders, of a variety of character, under diverse circumstances, to be subjected to the freakish, or arbitrary and capricious infliction of death by electrocution.

352 So.2d at 484–485. Although that opinion refers to Johnny Harris, the reasoning is also appropriate in the case of Donald Thigpen. How else can society punish someone who has committed first degree murder, who has been allowed to escape the consequences of that action, and then who has murdered again?

Donald Thigpen is unfortunately a dangerous human being, who has killed twice, and if allowed to live or go free, given his past history, when it becomes convenient, will most certainly kill again.

### III. CONCLUSION

For the reasons stated above, this Court concludes that the petitioner Donald Thigpen has failed to establish that § 319 is facially unconstitutional, and in the alternative that he has failed to establish that he has suffered prejudice from any of the allegedly constitutional defects of the statute. See, *supra*, §§ IIE 1–5. The Court further concludes that there is no merit to any of the petitioner's remaining claims. See, *supra*, §§ IIE 6–9. Accordingly, this Court will by separate document enter this same day a judgment denying the petitioner's application for habeas corpus relief and dismissing the petition with prejudice.

IT IS SO ORDERED.